## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

DARIUS YOUNG                                          CIVIL ACTION

VERSUS                                               21-282-SDD-EWD

UOP LLC

## <u>RULING</u>

This matter is before the Court on the *Motion for Summary Judgment*[1] by Defendant, UOP LLC ("UOP" or "Defendant").  Plaintiff, Darius Young ("Young" or "Plaintiff") filed an *Opposition*[2] to this motion, to which Defendant filed a *Reply*,[3] and Plaintiff filed a *Sur-reply*.[4]  The Court previously entered an *Order* granting summary judgment in favor of Defendant, for written reasons to follow.[5]  The Court now assigns reasons below.

## I.    FACTUAL BACKGROUND[6]

Plaintiff became employed by Defendant in March 2013, at its Baton Rouge, Louisiana facility ("UOP Baton Rouge").[7] UOP Baton Rouge is a continuous chemical processing plant, operating 24 hours per day, seven days per week.[8] Plaintiff most recently held the position of Utilities Operator.[9]   In this position, Plaintiff's job duties

---

[1] Rec. Doc. 38.
[2] Rec. Doc. 39.
[3] Rec. Doc. 40.
[4] Rec. Doc. 43.
[5] Rec. Doc. 55.
[6] The following facts offered by Defendant are admitted by Plaintiff, unless otherwise indicated.
[7] Rec. Doc. 38-3, Darius Young Deposition, Vol. 1, p. 72.
[8] *Id.* at pp. 72, 75-76, 79.
[9] *Id.* at p. 73; Rec. Doc. 38-20, Casey Smithhart Declaration, ¶ 6.

included operating plant utilities, assisting the Board Operator, monitoring dust collectors, and maintaining pumps.[10]

As a Union member, Plaintiff received a copy of the Collective Bargaining Agreement ("CBA") between UOP Baton Rouge and the Union.[11] The CBA contains the following provision: "When the requirements of the plant will permit, and for justifiable reasons, an employee may on his/her written request be granted a leave of absence without pay for 1-week periods not to exceed thirty (30) days."[12] During his employment, Plaintiff never once submitted a written request for a leave of absence under the CBA's leave-of-absence provision.[13]

Under Baton Rouge UOP's Attendance Policy ("Attendance Policy"), employee absences are measured in "occurrences," which accrue on a rolling 12-month calendar basis and are subtracted on the anniversary of the occurrence.[14] Under the Attendance Policy, an employee must notify his supervisor prior to his shift start time if he is going to be absent or tardy, and failure to do so could result in occurrences.[15] When Plaintiff missed work, Defendant contends it was required to locate another employee certified to do Plaintiff's job to cover his shift.[16] Generally, when an Operator comes in late for his scheduled shift without notice, the Operator working the previous shift must stay and work overtime until the late person shows up to work.[17]  However, if no Operator is working the

---

[10] *Id.* at p. 73.
[11] *Id.* at p. 81; Rec. Doc. 38-5, Rule 30(b)(6) Deposition of Jenny Kabat, p. 45.
[12] *Id.* at pp. 84-85 and Exhibit 4 attached thereto at YOUNG 001099.
[13] *Id.* at p. 85.
[14] *Id.* at pp. 107-108 and Exhibit 6 attached thereto.
[15] *Id.* at p. 109; Rec. Doc. 38-5, p. 12.
[16] *Id.* at pp. 76-79; Rec. Doc. 38-6, Casey Smithhart Deposition, pp. 17-18.
[17] Rec. Doc. 38-7, Oscar Kitts Deposition, pp. 29-30.  Plaintiff denies this statement: "Sometimes UOP did not have a utility operator working night shifts. If a utility operator, as Young was, arrived late and UOP had no utility worker there during the night shift, no night-shift worker would stay over because of the utility operator's tardiness. See Ex. E at p. 30:13-19."  Rec. Doc. 39-1, ¶ 11.

night shift, coverage is determined on a case by case basis.[18]

Per the Attendance Policy, employees are subject to the following progressive discipline: Verbal Written Warning for two occurrences; Written Warning for three occurrences; Final Written Warning for four occurrences; and Termination of Employment for five occurrences.[19] An employee disciplined for attendance violations has the opportunity to bring forward any concerns about the violations throughout the entire disciplinary process.[20] Employees are not subject to discipline for absences taken pursuant to the Family and Medical Leave Act ("FMLA").[21] "Absences protected by law," including absences taken because of a disability, may be excused under the Attendance Policy.[22] If an employee is late to work by more than four minutes, but less than two hours, at the start of his scheduled shift, he will receive a half occurrence (known as a "tardy").[23] Further, if an employee is either absent a full day or absent for more than two hours at the start of his scheduled shift, but calls in absent to his supervisor within two hours of his shift start time, he will receive one occurrence (known as an "unexcused absence").[24] If an employee is absent for his scheduled shift and fails to call in absent to his supervisor within the first two hours of his shift start time, he will receive two occurrences (known as a "no call/no show").[25] Defendant terminated Plaintiff for absenteeism under the Attendance Policy.[26]

Employees seeking reasonable leave accommodations under the Americans with

---

[18] *Id.*
[19] Rec. Doc. 38-3, Darius Young Deposition, pp. 107-108 and Exhibit 6 attached thereto.
[20] Rec. Doc. 38-8, Sharon Player Deposition, p. 21.
[21] Rec. Doc. 38-6, pp. 11-12; Rec. Doc. 38-3, Exhibit 6 attached thereto.
[22] Rec. Doc. 38-9, Chris Spencer Deposition, pp. 14-16 and Exhibit 1 attached thereto.
[23] Rec. Doc. 38-3, pp. 101-102 and Exhibit 6 attached thereto.
[24] *Id.* at p. 104 and Exhibit 6 attached thereto.
[25] *Id.* at pp. 104-105 and Exhibit 6 attached thereto.
[26] *Id.* at p. 108

Disabilities Act ("ADA") must engage in the interactive process with Defendant, as described in Defendant's Employees and Applicants with Disabilities Policy.[27] In practice, Defendant's ADA interactive process typically proceeds as follows: (1) employee informs supervisor of an issue requiring extended or intermittent leave (including for medical appointments); (2) employee is instructed to pick up medical paperwork from Human Resources ("HR"); (3) employee's medical provider completes paperwork; (4) employee returns paperwork to HR; (5) HR reviews paperwork; and (6) Defendant approves or denies accommodation request based on information from medical provider.[28]  According to the Defendant, calling in sick for a medical appointment does not establish entitlement to leave under Defendant's ADA interactive process.[29]

Plaintiff was first diagnosed with hypertension (high blood pressure) in 2013, but he did nothing to treat his hypertension until late 2018.[30]  On or around August 29, 2018, Nurse Amy Watts ("Nurse Watts")—an employee of third-party medical provider Care on Site—performed a medical examination on Plaintiff during a work physical.[31] Nurse Watts noted Plaintiff's blood pressure was elevated at 160/90.[32]

Also on August 29, 2018, another Care on Site employee, Dr. Dominic Scimeca

---

[27] Rec. Doc. 38-10, Ashley Barnes Deposition, pp. 20-21; Rec. Doc. 38-5, pp. 24-25 and Exhibit 4 attached thereto.

[28] Rec. Doc. 38-10, Ashley Barnes Deposition, pp. 20-21

[29] *Id.* Plaintiff denies this statement: "It can be. Calling in sick for a medical appointment in which the employee tells supervisor—as Young did—that the company nurse (through the company doctor) instructed him to make appointment is enough information to initiate the ADA interactive process because the employee is telling employer he is seeing doctor for illness that the nurse fears poses a risk for employer should employee not be examined by doctor. Such illnesses include, as was the case for Young, the ADA disability hypertension. *See* Plaintiff's SUMF 115." Rec. Doc. 39-1, ¶ 22.  Because Plaintiff's citation does not support his denial, the Court will deem Defendant's fact admitted.

[30] Rec. Doc. 38-11, Darius Young Declaration; Rec. Doc. 38-3, pp. 114-118, 219, 349; Rec. Doc. 38-4, Darius Young Deposition, Vol. 2, Exhibit 19 attached thereto.

[31] Rec. Doc. 38-3, pp. 115, 120 and Exhibit 7 attached thereto; Rec. Doc. 38-12, Amy Watts Deposition, p. 5.

[32] *Id.*; Rec. Doc. 38-12, p. 7 and Exhibit 1 attached thereto.

("Dr. Scimeca"), examined Plaintiff, diagnosed Plaintiff with hypertension, and instructed Plaintiff to follow up with his primary care physician.[33] Several weeks later, on October 15, 2018, Plaintiff visited Dr. Wesley Penn ("Dr. Penn"), an internist, who took Plaintiff's blood pressure, noted Plaintiff's blood pressure was elevated at 170/100, and diagnosed Plaintiff with hypertension.[34] Plaintiff was scheduled to work an overtime shift on October 15, 2018.[35] Although Plaintiff scheduled his appointment with Dr. Penn immediately following his hypertension diagnosis on August 29, 2018, he did not inform Defendant of this appointment until October 15, 2018—the day of the appointment.[36] Before his October 15, 2018 visit to Dr. Penn, Plaintiff was not taking any prescribed medications for any medical problem.[37]

On October 15, 2018, Dr. Penn prescribed Plaintiff amlodipine (Norvasc), an antihypertensive drug, to take once a day.[38] At a follow-up appointment on November 2, 2018, Dr. Penn prescribed Plaintiff losartan (Cozaar) to take once a day, in addition to his existing amlodipine prescription, to address his hypertension.[39] Dr. Penn testified that

---

[33] Rec. Doc. 38-12, pp. 7-9 and Exhibit 1 attached thereto. Plaintiff denies this: "Dr. Scimeca does not review and sign the medical examination document until September 5, 2018 at Ex. J, Ex. 1 at its pages stamped UOP909 & UOP910." Rec. Doc. 39-1, ¶ 26. While it is true that Dr. Scimeca signed the document on September 5, 2018, it is also clear from the document that Plaintiff was examined on August 29, 2018, and the physician's diagnosis was made based on what he observed of Plaintiff on the date of examination. Rec. Doc. 38-12, p. 8. This does not undermine Defendant's proffered fact.

[34] Rec. Doc. 38-3, p. 123; Rec. Doc. 38-13, Dr. Wesley Penn Deposition, pp. 15, 18.

[35] *Id.* at p. 140. Plaintiff denies this: "Originally Plaintiff was scheduled to have a day off on October 15, 2018. It was only later near October 15, 2018 that UOP let Young know that he was scheduled for overtime on October 15th. *See* SUMF 117-119." Rec. Doc. 39-1, ¶ 28.

[36] *Id.* at pp. 123-124, 132- 133, 138-143 and Exhibit 8 attached thereto. Plaintiff denies this: "Denied as to date of scheduling appointment with Dr. Penn. Young was not notified of the hypertension diagnosis until September 5, 2018 as mentioned above regarding SUMF26 and 27." Rec. Doc. 39-1, ¶ 29.

[37] Rec. Doc. 38-13, Dr. Wesley Penn Deposition, pp. 14-15 and Exhibit 1 attached thereto.

[38] Rec. Doc. 38-3, pp. 126-127, 137; Rec. Doc. 38-14, Walgreens Pharmacy Records at UOP000885; Rec. Doc. 38-13, pp. 18-19.

[39] Rec. Doc. 38-3, pp. 126-127, 137-138; Rec. Doc. 38-14, at UOP000885; Rec. Doc. 38-13, pp. 27-29.

drowsiness is not a "super common" side effect of amlodipine and losartan.[40] Even if a hypertension medication caused drowsiness, the drowsiness would only last for one day—in other words, a person who takes hypertension medication on Monday and stops taking the medication for the next two days will not still be drowsy on Thursday.[41] Dr. Penn advised Plaintiff that any side effects from his hypertension medications were a result of Plaintiff's body adjusting to the medications.[42] In the uncommon event that amlodipine and losartan cause drowsiness, a person should be able to adjust to the medications and ameliorate any drowsiness by taking the pills daily, at the same time of day.[43] Although Plaintiff testified that he complained to Dr. Penn about drowsiness and a host of other side effects,[44] Dr. Penn testified that his records for Plaintiff did not indicate any complaints about the side effects of amlodipine or losartan, including that they caused drowsiness.[45]

Plaintiff admits that factors completely unrelated to hypertension, including Plaintiff's daily tobacco vaping habit, asthma, obesity, and potential undiagnosed sleep apnea, could have been the cause of Plaintiff's inability to sleep well while taking hypertension medications.[46] The medical evidence in this matter establishes that painful swelling and gout of a unilateral extremity (*i.e.*, just on the left side), from which Plaintiff

---

[40] Rec. Doc. 38-13, pp. 19, 28; Rec. Doc. 38-15, Dr. Tyrone Girod Deposition, pp. 52-53. Plaintiff denies this: "It is a recognized side effect of amlodipine[.] See SUMF 176." Rec. Doc. 39-1, ¶ 33.

[41] Rec. Doc. 38-15, Dr. Tyrone Girod Deposition, pp. 52-53.

[42] Rec. Doc. 38-3, p. 129.

[43] Rec. Doc. 38-13, pp. 21, 29. Plaintiff denies this: "See SUMF 130. UOP operators including Young worked swing shifts; alternating working between day and night shifts. This rule may work well for persons who wake and sleep at about the same time each day but it is unreasonable to assume this would be necessarily be true to employees working swing shifts." Rec. Doc. 39-1, ¶ 36.

[44] Rec. Doc. 39-32, pp. 128-129.

[45] Rec. Doc. 38-13, pp. 26-27, 34. Plaintiff denies this: "See SUMF 127." Rec. Doc. 39-1, ¶ 37.

[46] *Id.* at pp. 13- 14; Rec. Doc. 38-15, pp. 46, 60.

suffered, are not side effects of amlodipine and losartan.[47] Hypertension alone does not cause unilateral swelling of the lower extremities.[48]

Plaintiff admits he took his hypertension medications "for the most part" from October 15, 2018 through the end of 2018, but it was "completely possible" he "missed a day," and he could not identify the specific days he did or did not take his medications.[49] Plaintiff called out absent and/or arrived tardy for his shift on October 15, 2018; November 9, 2018; and November 11, 2018, accruing 2.5 occurrences.[50] Pursuant to the Attendance Policy, Defendant issued Plaintiff a Verbal Warning on November 15, 2018, and advised him that if he engaged in further violations of the Attendance Policy, he could be subject to further disciplinary action, up to and including termination.[51] Prior to receiving the November 15, 2018 Verbal Written Warning, Plaintiff did not inform Defendant he was being treated by his doctor for hypertension, nor did he inform Defendant he believed his absences were due to hypertension or hypertension medications.[52]

Plaintiff admits that, on November 20, 2018, he arrived tardy to his shift and accrued a half occurrence.[53] In accordance with the Attendance Policy, Defendant issued Plaintiff a Written Warning on November 28, 2018, and advised him that if he engaged in further violations of the Attendance Policy, he could be subject to further disciplinary

---

[47] *Id.* at pp. 20-21, 28, 33, 68; Rec. Doc. 38-15, pp. 23-26, 52; Rec. Doc. 38-16, Dr. Daniel Kapusta Expert Report.

[48] *Id.* at p. 57.

[49] Rec. Doc. 38-4, pp. 358-359.

[50] Rec. Doc. 38-3, pp. 132-133, 138-143 and Exhibit 8 attached thereto. Plaintiff denies this: "As to 'Plaintiff called out absent', Plaintiff called UOP prior to work start that he had a doctor's appointment that day as recommended by the company doctor and asked to be excused." Rec. Doc. 39-1, ¶ 37.  Because Plaintiff fails to support this counter-statement with record evidence, the Court will not consider Defendant's statement controverted.

[51] *Id.* at pp. 132-133, 138-143 and Exhibit 8 attached thereto.

[52] *Id.* at pp. 143-145.

[53] *Id.* at pp. 147-149 and Exhibit 9 attached thereto.

action, up to and including termination.[54] Plaintiff also admits that, prior to receiving the November 28, 2018 Written Warning, Plaintiff did not inform Defendant he believed his absences were due to his hypertension or hypertension medications.[55]

Plaintiff began experiencing pain in his left foot on or around December 1, 2018.[56] On December 3, 2018, Plaintiff visited Dr. Penn and Dr. Joseph Albergamo (Dr. Albergamo"), who diagnosed Plaintiff with gout.[57] Drs. Penn and Albergamo did not connect Plaintiff's foot pain to his hypertension medications.[58] Plaintiff requested and UOP granted him continuous FMLA leave from November 28, 2018 to February 20, 2019, plus additional unpaid leave through March 11, 2019, to receive treatment for gout, after Plaintiff submitted medical documentation from his treating physicians indicating that this medical condition affected his ability to walk and bear weight on his left foot.[59] Plaintiff's FMLA file does not mention hypertension or side effects of hypertension medications as a basis for FMLA leave.[60] While Plaintiff was experiencing foot pain, Dr. Penn advised him to keep taking his hypertension medication "no matter what."[61]

Glenn Barbour ("Barbour"), one of Plaintiff's supervisors, visited Plaintiff's home around Christmas 2018 to check on Plaintiff's health, give Plaintiff a gift card for a ham or turkey (something Barbour did for every employee on Plaintiff's shift that year), and wish Plaintiff a Merry Christmas.[62] Plaintiff admitted he had no proof Barbour's visit was a

---

[54] *Id.*
[55] *Id.* at p. 150.
[56] *Id.* at pp. 153-155.
[57] *Id.* at p. 156.
[58] *Id.*
[59] *Id.* at p. 157; Rec. Doc. 38-17, CIGNA FMLA records.
[60] *See* Rec. Doc. 38-17, CIGNA FMLA records.
[61] Rec. Doc. 38-3, p. 158.
[62] *Id.* at pp. 159-161; Rec. Doc. 38-18, Glenn Barbour Deposition, pp. 14-15, 19.

reconnaissance mission to determine if Plaintiff was actually sick.[63]

Between December 10, 2019 and January 9, 2019, two of Plaintiff's physicians, Dr. Penn and Dr. Hector Mena ("Dr. Mena"), prescribed Plaintiff hydrocodone (Norco) to take as needed for pain.[64] Hydrocodone had the side effect of making Plaintiff sleep.[65] Hydrocodone is an opioid narcotic known for causing a sedation side effect, which patients may report as fatigue or tiredness.[66] Plaintiff called Dr. Mena's office for a Norco refill on January 7, 2019 and was told he could not have a refill at that time; Plaintiff indicated to Dr. Mena's office he was not happy about this.[67]

On or around January 9, 2019, Plaintiff visited Dr. Patrick Hall ("Dr. Hall"), a podiatrist, who diagnosed Plaintiff with likely gout, prescribed Plaintiff indomethacin, and put him in a walking boot. Indomethacin is an anti-inflammatory drug for treating swelling and pain caused by gout, which rarely causes a drowsiness side effect.[68] Drs. Penn and Hall did not believe Plaintiff's gout was caused by his hypertension medications, nor did Plaintiff express any such concerns to either of them.[69] On January 9, 2019, after performing his own internet research, Plaintiff decided to take amlodipine and losartan "occasionally," "sparingly," and "nowhere near every day" until July 5, 2019, and he went entire months without taking these two medications during this time period.[70] Plaintiff did

---

[63] *Id.* at pp. 161-162.
[64] *Id.* at pp. 164, 169, 177-178 and Exhibit 10 attached thereto. Plaintiff denies this: "The two doctors did not do so concurrently. A copy of Young's prescription purchases show that Penn prescribed them only on 12/10/2018 and Mena only on 12/21 and 12/27. See Plaintiff's Ex. 28 at UOP887." Rec. Doc. 39-1, ¶ 56.  Plaintiff's denial does not controvert Defendant's proffered fact.
[65] *Id.* at pp. 165-166.
[66] Rec. Doc. 38-16, Dr. Daniel Kapusta Expert Report.
[67] Rec. Doc. 38-3, pp. 173-175.
[68] Rec. Doc. 38-19, Dr. Patrick Hall Deposition, pp. 23, 28-29; Rec. Doc. 38-13, pp. 34-35, 63-64; Rec. Doc. 38-16.
[69] Rec. Doc. 38-13, pp. 32, 39, 40; Rec. Doc. 38-19, pp. 24-25, 43-44.
[70] Rec. Doc. 38-4, pp. 229, 233; Rec. Doc. 38-11, ¶¶ 13, 15, 17.

not refill his amlodipine and losartan prescriptions between January 2019 and July 2019.[71] Plaintiff cannot identify the days on which he took his hypertension medication between January 9, 2019 and July 5, 2019.[72] Plaintiff unilaterally decided to take his hypertension medication sparingly—no medical professional ever advised him to take his medication sparingly.[73]

On February 13, 2019, Dr. Hall noted that Plaintiff's left foot condition was improving after going through several weeks of physical therapy, noted that Plaintiff was able to put on his shoe, and advised Plaintiff that he should be able to return to work around March 2019.[74] On February 13, 2019, CIGNA, Defendant's third-party medical leave provider, informed Plaintiff that he would exhaust his FMLA leave on February 20, 2019, and any absences beyond that date may be subject to the Attendance Policy.[75] Plaintiff returned to work on March 13, 2019, roughly two weeks after he exhausted his 12 weeks of FMLA leave.[76] Despite this technical attendance infraction, Defendant did not discipline Plaintiff for his absences during the roughly two weeks of unpaid leave following his exhaustion of twelve weeks of FMLA leave.[77]

Upon his return to work, Plaintiff presented a note from Dr. Hall, which stated Plaintiff could return to full-duty work without any activity restrictions.[78] Plaintiff never

---

[71] *Id.* at p. 331; Rec. Doc. 38-11, ¶ 19. Plaintiff denies this: "See Plaintiff's Ex. 28 at UOP885-886. Young's last purchases of these drugs were on January 5 (amlodipiine) and January 8, 2019 (losartan). No purchases of these drugs were made again to date of the document, 8/30/2022." Rec. Doc. 39-1, ¶ 64. Plaintiff's denial does not controvert Defendant's proffered fact.

[72] *Id.* at pp. 306-307.

[73] *Id.* at pp. 229, 233, 307- 308.

[74] Rec. Doc. 38-3, pp. 179-181 and Exhibit 14 attached thereto.

[75] *Id.* at pp. 187-188 and Exhibit 15 attached thereto.

[76] *Id.* at pp. 188-189.

[77] *Id.* at pp. 187-189 and Exhibit 15 attached thereto; Rec. Doc. 38-6, pp. 11-12.

[78] *Id.* at pp. 189-190 and Exhibit 16 attached thereto.

sought medical care for foot problems following March 2019.[79] Nevertheless, Plaintiff arrived tardy for his shifts on April 27, 2019; May 2, 2019; and May 30, 2019, accruing 1.5 occurrences.[80] When asked specifically if he took his hypertension medications in advance of his three absences in April and May 2019 absences, Plaintiff testified he did not know.[81]

Per the Attendance Policy, Defendant issued Plaintiff a Final Written Warning on June 12, 2019, and advised him that if he engaged in further violations of the Attendance Policy, he could be subject to further disciplinary action, up to and including termination.[82] The write-ups from each of Plaintiff's attendance disciplinary meetings reflect that Plaintiff "refused to sign" them, but they do not otherwise state that Plaintiff provided an explanation for his absences.[83] As a union steward, Plaintiff's practice was to not sign anything presented by Defendant and not to sign documents on behalf of other union members while representing them.[84]

On July 5, 2019, Plaintiff visited an urgent care facility, where a doctor advised him that his blood pressure was "extremely high" and urged him to start taking his hypertension medications again, or else suffer a potential heart attack, stroke, or death.[85] Plaintiff never discussed his hypertension with Oscar Kitts ("Kitts"), his direct supervisor.; Kitts testified that he knew only of Plaintiff's "circulation issue" involving his foot.[86] Defendant maintains neither Operations Manager Christopher Spencer ("Spencer") nor

---

[79] *Id.* at pp. 192-193.
[80] Rec. Doc. 38-4, pp. 239-240, 247-248 and Exhibit 17 attached thereto.
[81] *Id.* at pp. 306-307, 309.
[82] *Id.* at pp. 239-240, 247-248 and Exhibit 17 attached thereto.
[83] Rec. Doc. 38-3, pp. 138-140 and Exhibits 8-9 attached thereto; Rec. Doc. 38-4, Exhibit 17 attached thereto.
[84] Rec. Doc. 38-3, p. 81; Rec. Doc. 38-9, pp. 30-31.
[85] *Id.* at pp. 251- 252; Rec. Doc. 38-11, ¶ 18.
[86] Rec. Doc. 38-7, p. 17. Plaintiff denies this: "See SUMF 149." Rec. Doc. 39-1, ¶ 80.

Kitts knew Plaintiff had hypertension while Plaintiff worked for Defendant.[87] Plaintiff testified that, on July 10, 2019, after his foot started swelling and causing him pain, Plaintiff took indomethacin and one of his leftover hydrocodone pills from a 2018 prescription before bedtime.[88] Plaintiff did not consult a doctor before taking hydrocodone on July 10, 2019.[89] Plaintiff did not take any hypertension medication on July 10, 2019.[90]

On July 11, 2019, Plaintiff failed to report to work or timely contact his supervisor within the first two hours of his shift start time to report his absence ("no call/no show"), accruing two occurrences.[91] At 7:07 a.m. on July 11, 2019, over two hours after Plaintiff's shift began, Plaintiff texted Kitts and advised that he was "[n]ot gonna make it"—without mentioning anything about his health condition.[92] Plaintiff's no call/no show on July 11, 2019 brought his rolling 12-month occurrence total to 6.5 occurrences, well over the five required to trigger termination.[93] On August 16, 2019, Defendant terminated Plaintiff's employment per the Attendance Policy for incurring more than five occurrences over the preceding, rolling 12-month period.[94] The decision to terminate Plaintiff was a collaborative decision made by Spencer, Plant Manager Casey Smithhart ("Smithhart"),

---

[87] *Id.* at pp. 28-29; Rec. Doc. 38-9, p. 37. Plaintiff denies this: "See SUMF 149, 156. For Kitts on July 5, 2019 and for Spencer on about July 18, 2019." Rec. Doc. 39-1, ¶ 81.

[88] Rec. Doc. 38-4, pp. 254-260, 346-347. Plaintiff denies this: "The indomethacin was purchased on February 25, 2019. See Plaintiff's Ex. 28 at UOP893." Rec. Doc. 39-1, ¶ 82. Plaintiff's denial is undermined by his direct testimony that he took indomethacin on July 10, 2018.

[89] *Id.* at p. 256.

[90] *Id.* at pp. 267-268. Plaintiff denies this: "He did take it that day. See SUMF 153." Rec. Doc. 39-1, ¶ 84. Plaintiff citation does not support his denial.

[91] *Id.* at pp. 268, 270-271. (Q: did you tell anybody at UP that you were not going to come to work on July 11th prior to you not showing up? A: No.") Plaintiff denies this: "Young phoned Kitts at 4:57am. See Ex. 29 at Young1286 for Young's phone calls to Kitts that morning starting at 4:57am CST/9:57 UTC at 225-543-2606." Rec. Doc. 39-1, ¶ 85. First, Plaintiff's denial contradicts his sworn deposition testimony; second, Plaintiff's phone records do not indicate or provide the Court the means to determine that attempted calls were made to Kitts's phone.

[92] *Id.* at p. 315 and Exhibit 19 attached thereto at YOUNG 001139.

[93] Rec. Doc. 38-4, Exhibit 18 attached thereto.

[94] *Id.* at pp. 288-290 and Exhibit 18 attached thereto.

local and regional HR, and Defendant's internal legal counsel.[95]

UOP maintains Plaintiff never advised it that he believed his absences were related to his hypertension and never asked for an accommodation of unscheduled leave time to get his alleged hypertension-related conditions under control.[96] Spencer had no suspicion that Plaintiff's post-leave absences were related to a medical problem because Plaintiff "wouldn't have been released back to [work] with a full bill of health" if he had any sort of medical issue.[97] Smithhart testified that he considered Plaintiff the "same as any other employee" upon Plaintiff's return to work because Plaintiff was "approved full duty, with no restrictions."[98]

UOP maintains it is unreasonable to be asked to accommodate an employee's request to miss or be tardy for his scheduled shifts on intermittent days without prior notice, thus forcing Defendant to scramble to find someone to cover his shift.[99] Defendant's business and other Operators' overtime schedules are adversely affected when an employee is not reliable and dependable and does not come to work on time.[100] UOP employees with doctors' appointments can work with their supervisors to adjust their schedules to avoid missing work, or an occurrence, because of a prescheduled and

---

[95] Rec. Doc. 38-9, pp. 32-33; Rec. Doc. 38-8, p. 21.

[96] Rec. Doc. 38-4, pp. 282-285; Rec. Doc. 38-6, pp. 10, 15-17; Rec. Doc. 38-9, pp. 36-38.  Plaintiff denies this: "See SUMF 149, 156. Young explicitly told each that his absences were related to his hypertension: for Kitts on July 5, 2019 and for Spencer on about July 18, 2019. Young repeatedly told supervisor Kitts and Barbour and operations manager Spencer that his tardies and absences are due to his health and should be excused because of his medical condition. This was done around the times UOP disciplined him for tardies and absences and during discussions of the warnings issued for attendance in November 2018 and June 2019. See SUMF 132, 149, 156." Rec. Doc. 39-1, ¶ 90.

[97] Rec. Doc. 38-9, pp. 29- 30. Plaintiff denies this: "Young repeatedly told Spencer the tardies and absences were due to his health. He went into great detail on about July 18, 2019. See SUMF 132, 156." Rec. Doc. 39-1, ¶ 91.

[98] Rec. Doc. 38-6, pp. 13-14.

[99] Rec. Doc. 38-4, pp. 286-287; Rec. Doc. 38-6, p. 18. Plaintiff denies this: "It is reasonable to allow a small amount of unscheduled leave for any employee with unused vacation time who is sick and had no advance warning of his illness. See SUMF125." Rec. Doc. 39-1, ¶ 106.

[100] Rec. Doc. 38-7, p. 31.

known doctor's appointment.[101]

Plaintiff stopped taking his hypertension medications a couple of weeks after his August 16, 2019 termination.[102] Plaintiff did not resume taking hypertension medications until two weeks before his July 18, 2022 deposition for the present lawsuit.[103]

Plaintiff offers the following facts in response to those offered by Defendant.[104] Plaintiff contends he met the essential functions of his position while employed at UOP from 2013 through 2019, and he did not have attendance problems at UOP prior to November 2018.[105] Plaintiff contends "company" Nurse Watts "warned" him on September 5, 2018 about his blood pressure and told him to see his physician or risk his return to work.[106] Thus, Plaintiff scheduled a doctor's appointment on his day off, October 15, 2018.[107]

---

[101] Rec. Doc. 38-7, pp. 31-33. Plaintiff denies this: "This did not occur with Mr. Young on October 15, 2018. See SUMF117-119." Rec. Doc. 39-1, ¶ 106.

[102] Rec. Doc. 38-3, p. 18.

[103] *Id.* at pp. 15-16.

[104] Defendant denies nearly every fact offered by Plaintiff, as the Court will note.

[105] Rec. Doc. 39-34, p. 21; Rec. Doc. 39-33, p. 9; Rec. Doc. 39-32, p. 81. Defendant denies this: "In his final year of employment, Plaintiff could not meet the most basic and essential function of his position—showing up to work—because he was absent and/or tardy from work on several occasions between October 2018 and July 2019. Plaintiff did have attendance problems prior to November 2018, as he received an occurrence under the Attendance Policy for his unexcused absence on October 15, 2018. R. Doc. 38-3, pp. 110-111; R. Doc. 38-4, pp. 61-62." Rec. Doc. 40-1, ¶114.

[106] Rec. Doc. 39-38, pp. 7-8 referring to Ex. 1 (Young909); Rec. Doc. 39-32, p. 115. Defendant denies this: "The nurse who examined Plaintiff, Amy Watts, was employed by Care On Site, Defendant's third-party medical provider. On or around August 29, 2018, Nurse Watts noted Plaintiff's blood pressure was elevated at 160/90. Nurse Watts could not recall specifically telling Plaintiff to see his physician about his blood pressure. Nurse Watts is not qualified to diagnose illness. Nurse Watts deferred all discussions about the impact of Plaintiff's medical conditions on his work abilities to Dr. Dominic Scimeca, the Care On Site physician who examined Plaintiff following Nurse Watts' initial examination. Plaintiff's examination notes do not state that Plaintiff risked his return to work if he did not see a physician for his hypertension. R. Doc. 38-12, pp. 4–13." Rec. Doc. 40-1, ¶115.

[107] Rec. Doc. 39-27, ¶5. Defendant denies this: "The nurse who examined Plaintiff, Amy Watts, was employed by Care On Site, Defendant's third-party medical provider. Nurse Watts could not recall specifically telling Plaintiff to see his physician about his blood pressure. Nurse Watts deferred all discussions about the impact of Plaintiff's medical conditions on his work abilities to Dr. Dominic Scimeca, the Care On Site physician who examined Plaintiff following Nurse Watts' initial examination. Plaintiff was scheduled to work an overtime shift on October 15, 2018. R. Doc. 38- 12, pp. 4-8; R. Doc. 38-3, p. 41." Rec. Doc. 40-1, ¶116.

Plaintiff claims he could [not] know weeks in advance when his days off at UOP would be[108] because UOP's procedure for noticing work schedules could be days or hours in advance.[109] Plaintiff contends UOP notified him that he was to work overtime on October 15, 2018 shortly before October 15, 2018.[110] Prior to the doctor's appointment and prior to the time his work was to begin, Plaintiff claims he advised his supervisor that he had already scheduled a doctor's appointment for this day, his day off, in compliance with Nurse Watts' instructions. Thus, Plaintiff requested that his regularly-scheduled day off - October 15, 2018 - be excused.[111]  Plaintiff went to the doctor's appointment, and UOP declared his absence unexcused.[112]  Barbour testified that Plaintiff told him in October 2018 that Watts recommended he see a doctor.[113]

---

[108] Plaintiff's cited evidence does not support this statement.  Further, the Court assumes "not" belongs in this sentence; otherwise, the following sentences do not make sense in relation to Plaintiff's argument.

[109] Rec. Doc. 39-38, ¶10. Defendant denies this: "Plaintiff's self-serving, conclusory, and unsubstantiated testimony—the only "evidence" supporting this "fact"—is incompetent summary judgment evidence. *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Tr.*, 541 F. App'x 443, 447 (5th Cir. 2013)."  Rec. Doc. 40-1, ¶117.

[110] Rec. Doc. 39-27, ¶5. Defendant denies this: "Plaintiff's self-serving, conclusory, and unsubstantiated testimony—the only "evidence" supporting this "fact"—is incompetent summary judgment evidence. *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Tr.*, 541 F. App'x 443, 447 (5th Cir. 2013)."  Rec. Doc. 40-1, ¶118.

[111] Rec. Doc. 39-33, p. 12; Rec. Doc. 39-32, p. 130; Rec. Doc. 39-27, ¶5. Defendant denies this: "The nurse who examined Plaintiff, Amy Watts, was employed by Care On Site, Defendant's third-party medical provider. Nurse Watts could not recall specifically telling Plaintiff to see his physician about his blood pressure. Nurse Watts deferred all discussions about the impact of Plaintiff's medical conditions on his work abilities to Dr. Dominic Scimeca, the Care On Site physician who examined Plaintiff following Nurse Watts' initial examination. Plaintiff was scheduled to work an overtime shift on October 15, 2018. Plaintiff did not call in absent for the doctor's appointment until the day of his appointment. Calling in absent on the day of a scheduled shift violates the Attendance Policy. R. Doc. 38-3, pp. 20, 41, 102; R. Doc. 38-12, pp. 4–8." Rec. Doc. 40-1, ¶119.

[112] Rec. Doc. 39-27, ¶5; Rec. Doc. 39-2. Defendant denies this: "Defendant did not "declare" Plaintiff's absence unexcused because he went to the doctor. Defendant gave Plaintiff one occurrence for an unexcused absence because Plaintiff called in absent for a scheduled overtime shift on the day of his shift, in violation of the Attendance Policy. R. Doc. 38-3, p. 110." Rec. Doc. 40-1, ¶120.

[113] Rec. Doc. 39-33, p. 10. Defendant denies this: "The nurse who examined Plaintiff, Amy Watts, was employed by Care On Site, Defendant's third-party medical provider. Plaintiff misstates Barbour's testimony to argue Barbour knew about Plaintiff's appointment in advance of the appointment. In reality, Barbour was asked if he was "aware that in 2018 the nurse contracted with UOP instructed Mr. Young as a follow-up to her exam to see his doctor" and testified Plaintiff "told me she told him to go see the doctor." Barbour never testified he knew about Plaintiff's appointment before it occurred. Barbour also did not testify that the nurse

Under UOP's previous attendance policy, some unscheduled, one-day absences due to sickness or doctor appointments had been excused.[114] However, in July 2018, UOP implemented a new attendance policy that did not provide sick leave.[115] Plaintiff claims that, of the ten Honeywell/UOP chemical plants in 2018 and 2019, UOP Baton Rouge was the only plant that did not provide employees sick leave since July 2018.[116]

Plaintiff saw Dr. Penn in October 2018, and he diagnosed Plaintiff with hypertension and prescribed him amlodipine.[117] Two weeks after this diagnosis, Plaintiff claims he complained to Dr. Penn that he was experiencing random tiredness, nausea and headaches;[118] Dr. Penn's records do not document these complaints.  In response, Dr. Penn allegedly told Plaintiff that he would adjust to the medication, and he added a second hypertension pill—losartan.[119] Plaintiff claims he was suffering from hypertension

---

[114] Rec. Doc. 39-6, UOP 430: "Special circumstances will be evaluated on a case-by-case basis" and at Section B. Defendant denies this: "The attendance policy that preceded the July 2018 attendance policy did not list "unscheduled one-day absences due to sickness or doctor appointments" as a category of excused absences. R. Doc. 39-6." Rec. Doc. 40-1, ¶123.

[115] Rec. Doc. 39-7. Defendant denies this: "Louisiana law does not require private employers to provide employees with paid or unpaid sick leave. The UOP Baton Rouge Attendance Policy effective July 1, 2018 excuses absences that qualify an employee for leave under the Family and Medical Leave Act or similar state laws, and further excuses "other absences protected by law." Defendant's Employees and Applicants with Disabilities Policy provides: "A leave of absence may be a form of reasonable accommodation [under the Americans with Disabilities Act] under certain circumstances." R. Doc. 38-3, pp. 102-103; R. Doc. 38-5, pp. 6, 10." Rec. Doc. 40-1, ¶124.

[116] Rec. Doc. 39-37, p. 6; Compare item 'v' in Rec. Doc. 39-7 and Rec. Doc. 39-8. Defendant denies this: "Louisiana law does not require private employers to provide employees with paid or unpaid sick leave. The UOP Baton Rouge Attendance Policy effective July 1, 2018 excuses absences that qualify an employee for leave under the Family and Medical Leave Act or similar state laws, and further excuses "other absences protected by law." Defendant's Employees and Applicants with Disabilities Policy provides that "A leave of absence may be a form of reasonable accommodation [under the Americans with Disabilities Act] under certain circumstances." R. Doc. 38-3, pp. 102-103; R. Doc. 38-5, pp. 6, 10." Rec. Doc. 40-1, ¶125.

[117] Rec. Doc. 39-10 at UOP803.

[118] Rec. Doc. 39-32, pp. 128-129 referring to Rec. Doc. 1. Defendant denies this: "Dr. Wesley Penn testified Plaintiff never complained to him about any side effects of his prescribed hypertension medications, and the examination notes from this visit with Dr. Penn do not reference complaints of random tiredness, nauseousness, and headache. R. Doc. 38-13, pp. 11-12, 17; R. Doc. 39-11." Rec. Doc. 40-1, ¶127.

[119] Rec. Doc. 39-11 at UOP806; Rec. Doc. 39-28, ¶7. Defendant denies this: "Dr. Wesley Penn testified Plaintiff never complained to him about any side effects of his prescribed hypertension medications; the

medication side effects in November 2018 when he incurred another two tardies and an absence.[120] Plaintiff credits Dr. Penn with Plaintiff's claim that working swing shifts can cause sleeping problems, which can worsen with medications causing drowsiness, and a method to combat the drowsiness—taking pills at same time each day before bed—is impossible when working twelve-hour swing shifts.[121]  However, Dr. Penn said no such thing, and Plaintiff offers absolutely no evidence to support this statement.

UOP disciplined Plaintiff for attendance violations on November 15, 2018. Five days later, tardy again, UOP issued Plaintiff a second warning. Plaintiff met with his supervisors each time a warning was issued. Plaintiff claims he objected to the warnings and refused to sign the reprimands.[122]  Plaintiff further claims that, during the time period that he received occurrences and warnings for absences and tardies - November 2018 through June 2019 – he had asked his supervisors and manager for assistance because these infractions were caused by his health issues and not his personal fault.  In these

---

examination notes from this visit with Dr. Penn do not reference complaints of random tiredness, nauseousness, and headache; and the notes do not indicate Dr. Penn prescribed losartan based on any such complaints. R. Doc. 38-13, pp. 11-12, 17; R. Doc. 39-11; R. Doc. 39-13." Rec. Doc. 40-1, ¶128.

[120] Rec. Doc. 39-32, pp. 129-131; Rec. Docs. 39-2 & 39-3. Defendant denies this: "Dr. Wesley Penn testified Plaintiff never complained to him about any side effects of his prescribed hypertension medications, nor do Plaintiff's medical examination records reference such complaints. Additionally, Plaintiff never told Defendant his tardiness and absences in November 2018 were hypertension-related. Plaintiff admitted he took his hypertension medications "for the most part" from October 15, 2018 through the end of 2018, but it was "completely possible" he "missed a day" and he could not identify the specific days he did or did not take his pills. R. Doc. 38-13, pp. 11-12, 17; R. Doc. 39-11; R. Doc. 39-13; R. Doc. 38-3, pp. 44-46, 50; R. Doc. 38-4, pp. 40-41." Rec. Doc. 40-1, ¶129.

[121] Rec. Doc. 39-39, p. 29. Defendant denies this: "The only evidence Plaintiff cites in support of this fact is Dr. Penn's deposition testimony, which does not support this fact whatsoever. Dr. Penn did not testify about UOP's operators, swing shifts, the effect of swing shifts on sleeping patterns, or taking medications while working swing shifts. Nor did Dr. Penn testify that "[a] method to combat the drowsiness—taking pills at same time each day before bed—is impossible when working twelve-hour swing shifts." Moreover, Plaintiff's prescribed hypertension medications do not generally cause drowsiness, nor did Plaintiff ever complain his hypertension medications were making him drowsy. R. Doc. 39-39, p. 7; R. Doc. 38-13, pp. 8, 11-13, 17; R. Doc. 38-15, pp. 9-10; R. Doc. 39-11; R. Doc. 39-13." Rec. Doc. 40-1, ¶130.

[122] Rec. Docs. 39-2 & 39-3. Defendant denies this: "Plaintiff did not make any objections to his attendance warnings. R. Doc. 38-13, pp. 110-111." Rec. Doc. 40-1, ¶131.

reprimand meetings, Plaintiff claims he asked that his attendance issues be excused.[123]

On December 1, 2018, eleven days after his last tardy, Plaintiff woke with a swollen left foot and was unable to walk,[124] so he sought treatment that very day.[125]  Plaintiff claims he had not improved and was still in excruciating pain on January 9, 2019; however, his podiatrist, Dr. Patrick Hall, noted that, although Plaintiff reported "exquisite tenderness" in his left foot, a steroid shot in his hip "helped quite a bit" and Plaintiff "has gotten some partial improvement."[126] Plaintiff claims Dr. Hall advised him on this date that his diagnosis of gout was odd given his normal uric-acid levels, and that he was not an authority on gout.[127] However, this is directly contradicted by Dr. Hall who, as a podiatrist, is in fact an authority on gout.[128]

Following this exam, Plaintiff stopped taking his hypertension medication regularly and never again filled his amlodipine and losartan prescriptions.[129] In January 2019, Plaintiff was treated for gout with gout medication, a compression boot, and physical

---

[123] Rec. Doc. 39-32, pp. 128-129 (referring to Rec. Doc. 1), 143, 151 (referring to Rec. Doc. 1); Rec. Docs. 39-2 & 39-3. Defendant denies this: "Plaintiff did not provide any explanation for his absences at his attendance disciplinary meetings. Christopher Spencer (Operations Manager) did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. Plaintiff never discussed his hypertension with Casey Smithhart (Plant Manager). Plaintiff never discussed his hypertension with Oscar Kitts Supervisor); indeed, Kitts did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. R. Doc. 38-13, pp. 110-111; R. Doc. 38-4, pp. 61-62; R. Doc. 38-9, p. 13; R. Doc. 38-6, pp. 4, 9-11; R. Doc. 38-7, pp. 4-6." Rec. Doc. 40-1, ¶132.

[124] Rec. Doc. 39-32, pp. 153-154. Defendant denies this: "Plaintiff's medical notes from his December 1, 2018 visit to Lake After Hours state that Plaintiff's left foot "hurts to bear weight" but do not state he had an inability to walk. R. Doc. 39-12." Rec. Doc. 40-1, ¶133.

[125] Rec. Doc. 39-13 at UOP807; Rec. Doc. 39-12.  The Court notes that Rec. Doc. 39-13 does not contain a UOP 807, and Rec. Doc. 39-12 is a different date than identified by Plaintiff.

[126] Rec. Doc. 39-32, p. 174; Rec. Docs. 39-12, 39-13, & 39-31. Defendant denies this: "As of January 9, 2019, Plaintiff's podiatrist, Dr. Patrick Hall, noted that although Plaintiff reported "exquisite tenderness" in his left foot, a steroid shot in his hip "helped quite a bit" and Plaintiff "has gotten some partial improvement." R. Doc. 39-17." Rec. Doc. 40-1, ¶135.

[127] Rec. Doc. 39-32, pp. 305-306 (referring to Rec. Doc. 1). Defendant denies this: "Plaintiff testified Dr. Patrick Hall expressly told Plaintiff he was not an expert or authority on gout. R. Doc. 39-32, pp. 25-26." Rec. Doc. 40-1, ¶136.

[128] Rec. Doc. 38-19, p. 43.

[129] Rec. Doc. 39-32, pp. 305-306 (referring to Rec. Doc. 1); Rec. Doc. 39-40, p. 51; Rec. Doc. 39-29 at UOP885-6 for list of amlodipine purchases.

therapy, which led to improvement.[130]

Plaintiff claims he still felt poorly after he returned to work on March 13, 2019.[131] By his return date, he had not been taking his hypertension medication regularly, so his hypertension was essentially untreated.[132]  After his return to work, Plaintiff was tardy three times on April 27, May 2, and May 30, 2019. UOP gave Plaintiff a final written reprimand on June 12, warning him that any additional tardies or absences could trigger termination.[133]

On July 2, 2019, Plaintiff claims he was so ill that he texted and called his supervisor requesting the day off.[134]  In contravention of the sick-leave policy, Plaintiff claims Kitts did not record Plaintiff's absence on July 2, 2019 as unexcused.[135] Subsequently, Plaintiff's health worsened, he vomited, and he went to an emergency clinic on Friday, July 5.[136] The clinic doctor advised Plaintiff that his blood pressure was

---

[130] Compare Rec. Doc. 39-18 with Rec. Docs. 39-19 & 39-20 (return to work by the doctor). Defendant denies this: "Young did not treat himself with gout medication, a compression boot, and physical therapy. R. Doc. 39-18; R. Doc. 39-19; R. Doc. 39-20." Rec. Doc. 40-1, ¶138.

[131] Rec. Doc. 39-32, pp. 90-91. Defendant denies this: "Upon his return to work in March 2019, Plaintiff presented a note from Dr. Patrick Hall, which stated Plaintiff could return to full duty work without any activity restrictions. Plaintiff never complained to UOP he was unwell after his return to work in March 2019. R. Doc. 38-3, pp. 75-76, 116; R. Doc. 38-4, pp. 25-28, 62; R. Doc. 38-6, pp. 4, 9-11; R. Doc. 38-9, pp. 12-14." Rec. Doc. 40-1, ¶139.

[132] Rec. Doc. 39-27, ¶¶ 13, 19.  Young admits not following hypertension treatment protocol.

[133] Rec. Doc. 39-4.

[134] Rec. Doc. 39-27, ¶14; Rec. Doc. 39-34, pp. 22-23; Rec. Doc. 39-30 at Young1250 (calls at 4:36am CST/9:36 UTC to Kitts at 225-439-2606). Defendant denies this: "Plaintiff's July 2, 2019 call logs and text messages do not indicate that Plaintiff informed Oscar Kitts that he was seeking a day off due to his hypertension; rather, the text messages simply stated Plaintiff was "sick." R. Doc. 39-30, p. 8; R. Doc 39-26." Rec. Doc. 40-1, ¶143.

[135] Rec. Doc. Nos. 39-4 & 39-5  (no recording of 7/2 absence). Defendant qualifies this statement as follows: Defendant admits Plaintiff did not receive an occurrence for his July 2, 2019 absence. Defendant denies having a "no sick-leave policy." Louisiana law does not require private employers to provide employees with paid or unpaid sick leave. The UOP Baton Rouge Attendance Policy effective July 1, 2018 excuses absences that qualify an employee for leave under the Family and Medical Leave Act or similar state laws, and further excuses "other absences protected by law." Defendant's Employees and Applicants with Disabilities Policy provides that "A leave of absence may be a form of reasonable accommodation [under the Americans with Disabilities Act] under certain circumstances." R. Doc. 38-3, pp. 102-103; R. Doc. 38-5, pp. 6, 10." Rec. Doc. 40-1, ¶144.

[136] Rec. Doc. 39-21 at UOP761.

extremely high at 166/101, and he measured his weight at 310 pounds.[137] Plaintiff claims

the clinic doctor told him to take time off and resume his hypertension medication or he

would be at risk of a stroke, heart attack, or death.[138]

Around noon on July 5, 2019, Plaintiff claims he advised Kitts of the clinic doctor's

instructions, which would have required Plaintiff to take leave for his night shift starting at

4:30pm.[139] Plaintiff contends both he and Kitts unsuccessfully tried to contact Spencer

and Smithhart for direction.[140] Receiving no response, Plaintiff went to his shift on July

5.[141] Plaintiff unsuccessfully attempted to contact Spencer again on July 9; however,

Plaintiff claims Kitts reached Spencer on July 9 and discussed his health issues from the

previous weekend.[142]   On July 10, 2019, Plaintiff claims he took his hypertension

---

[137] *Id.*; Rec. Doc. 39-32, pp. 251-253. Defendant denies this: "Plaintiff's medical notes from his July 5, 2019 Lake After Hours visit do not note that Plaintiff's blood pressure was "extremely high." R. Doc. 39-21." Rec. Doc. 40-1, ¶146.

[138] Rec. Doc. 39-32, pp. 251, 313-314 (referring to Rec. Doc. 39-26). Defendant denies this: "The notes from Plaintiff's July 5, 2019 visit to Lake After Hours do not reflect that the clinic doctor gave any advice on taking time off from work or restarting hypertension medications. R. Doc. 39-21. Plaintiff's self-serving, conclusory, and unsubstantiated testimony—the only "evidence" supporting this "fact"—is incompetent summary judgment evidence. *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Tr.*, 541 F. App'x 443, 447 (5th Cir. 2013)." Rec. Doc. 40-1, ¶147.

[139] Rec. Doc. 39-34, pp. 16-18; Rec. Doc. 39-32, pp. 313-314 (referring to Rec. Doc. 39-26); Rec. Doc. 39-30 at Young1261 (phone calls at 12:07 CST/17:07 UTC & 12:23pm CST to Kitts at 225-439-2606), Rec. Doc. 39-28, ¶9. Defendant denies this: "Plaintiff never discussed his hypertension with Oscar Kitts; indeed, Kitts did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. R. Doc. 38-7, pp. 4-6." Rec. Doc. 40-1, ¶149.

[140] Rec. Doc. 39-34, pp. 22-23; Rec. Doc. 39-32, pp. 235-237; Rec. Doc. 39-30 at Young1261 (Young's three unanswered calls at 12:05pm CST/17:05 UTC & text at 12:06pm to Spencer at 225-250-6137); Rec. Doc. 39-25 at Young1144 (text at 12:06pm); Rec. Doc. 39-26 (Kitts text to Young with Smithhart's phone number, 572-1213). Defendant denies this: "Neither Plaintiff's call log records nor his text messages from July 5, 2019 reflect that Plaintiff informed Oscar Kitts or Chris Spencer about any hypertension-related medical conditions. Plaintiff never discussed his hypertension with Kitts. Kitts and Spencer both testified they did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. R. Doc. 39-30, p. 19; R. Doc. 39-25, p. 2; R. Doc. 39-26; R. Doc. 38-7, pp. 4-6; R. Doc. 38-9, p. 13." Rec. Doc. 40-1, ¶148.

[141] Rec. Doc. 39-28, ¶ 9.

[142] Rec. Doc. 39-27 at @Young1277 (Young's three unanswered calls to Spencer at 225-250-6137 at 2:04pm CST/19:04 UTC); Rec. Doc. 39-25, @Young1145 (Spencer texts that he can't talk now); Rec. Doc. 39-34, p. 23. Defendant denies this: "Neither Plaintiff's call log records nor his text messages from July 9, 2019 reflect Plaintiff informed Oscar Kitts or Christopher Spencer about any hypertension-related medical conditions from the previous weekend. Kitts could not have discussed Plaintiff's hypertension with Spencer,

medication, which he had resumed on July 5.  When his foot began to swell,[143] Plaintiff became worried that he would receive anther infraction, so he claims he took leftover medication for gout and pain, went to bed, and missed work the next day because he was unable to wake in time.[144] Plaintiff was not contacted by Spencer or Smithhart about his health issues until after he was absent on July 11.[145]

Kitts testified that believed Spencer should have had a discussion with Plaintiff between July 5 and July 11, 2019 regarding his leave request[146] and that he believed UOP treated Plaintiff unfairly.[147]

After his July 11 absence, Plaintiff claims he and Spencer spoke in detail about his hypertension medication problems, and Plaintiff advised that the hypertension medication side effects caused his illness between July 2 and 11, 2019.  He further claims he showed Spencer photos of his medication bottles and of his foot and advised Spencer that he

---

as Plaintiff never discussed his hypertension with Kitts, and Kitts and Spencer did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. R. Doc. 38-7, pp. 4-6. R. Doc. 39-30, p. 35; R. Doc. 39-25, p. 3; R. Doc. 38-9, p. 13." Rec. Doc. 40-1, ¶151.

[143] Rec. Doc. 39-32, pp. 264-265. Defendant denies this: "Plaintiff did not take any hypertension medication on July 10, 2019. Plaintiff's hypertension medications do not cause a side effect of unilateral (one-sided) swelling. R. Doc. 38-4, pp. 21-22; R. Doc. 38-13, pp. 9-10, 13, 16, 24; R. Doc. 38-15, pp. 4-7, 9; R. Doc. 38-16, pp. 7-8, 14." Rec. Doc. 40-1, ¶153.

[144] Rec. Doc. 39-32, p. 268. The Court notes that there is no page 268 to the cited document filed with the Court.

[145] Rec. Doc. 39-32, pp. 271-272 (referring to Rec. Doc. 1). Defendant denies this: "Christopher Spencer (Operations Manager) did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. Plaintiff never discussed his hypertension with Casey Smithhart (Plant Manager). R. Doc. 38-9, p. 13; R. Doc. 38-6, pp. 4, 9-11." Rec. Doc. 40-1, ¶152.

[146] Rec. Doc. 39-34, pp. 23-24; Rec. Doc. 39-32, p. 271 (referring to Rec. Doc. 1). Defendant denies this: "Oscar Kitts testified he did not know the background information surrounding Plaintiff's disciplinary history preceding his termination, as such information was above his supervisory level. Plaintiff never discussed his hypertension with Kitts; indeed, Kitts did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. Moreover, such a conversation between Christopher Spencer and Plaintiff would have been impossible because Spencer did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. R. Doc. 39-34, p. 8; R. Doc. 38-7, pp. 4-6; R. Doc. 38-9, p. 13." Rec. Doc. 40-1, ¶155.

[147] Rec. Doc. 39-34, p. 24. Defendant denies this: "Oscar Kitts testified he did not have an opinion on whether Defendant should have excused Plaintiff's absence on October 15, 2018, noting that such a decision was "at the company's discretion" and was "above" Kitts' supervisory level. R. Doc. 39-34, p. 5." Rec. Doc. 40-1, ¶122.

would find a new doctor to review his hypertension medication.[148]

Dr. Tyrone Girod examined Plaintiff on August 1, 2019 and replaced his amlodipine and losartan with dyazide.[149] In response to an email from Spencer, Plaintiff advised that he had improved on this new medication.[150] Since this August 2019 visit with Dr. Girod, Plaintiff has not experienced any of the health issues he suffered from mid-August 2018 to late-July 2019.[151]  Plaintiff claims he has had no attendance problems in nearly three years of employment since July 12, 2019.[152]  Although his hypertension was untreated before and after the ten-month period of mid-October 2018 to late-July 2019, Plaintiff claims his health was at its worst while being treated for hypertension.[153] After being

---

[148] Rec. Doc. 39-32, pp. 195, 271-272 (referring to Rec. Doc. 1); Rec. Docs. 39-14, 39-15, & 39-16. Defendant denies this: "Such conversations would have been impossible because Christopher Spencer did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant, which terminated on August 16, 2019. Plaintiff never showed Spencer photographs of prescription bottles and his swollen foot, and never discussed his health condition with Spencer. R. Doc. 38-9, p. 13; R. Doc. 39-35, p. 2." Rec. Doc. 40-1, ¶156.

[149] Rec. Doc. 39-22 at UOP 735.

[150] Rec. Doc. 39-32, pp. 195-196; Rec. Doc. 39-27, ¶¶ 24, 27. Defendant denies this: "Christopher Spencer did not even know Plaintiff had hypertension during Plaintiff's employment with Defendant. Plaintiff never discussed his health condition with Spencer. As far as the alleged emails between Plaintiff and Spencer, Defendant searched its system and found no record of these emails and Plaintiff never produced these emails in discovery. R. Doc. 38-9, p. 13; R. Doc. 39-35, pp. 2-3. Plaintiff's self-serving testimony about the substance of written communications he has not produced should be discarded. *Morris v. Copart,* No. 4:15-CV-724, 2016 WL 6608874, at *3 (E.D. Tex. Nov. 9, 2016)." Rec. Doc. 40-1, ¶158.

[151] Rec. Doc. 39-32, pp. 68, 279; Rec. Doc. 39-28, ¶¶ 3-6. Defendant denies this: "Plaintiff's hypertension did not cause tardiness, drowsiness, or unilateral swelling in his left foot. Plaintiff also falsely suggests he began taking medications for his hypertension in "mid-August 2018." Plaintiff was prescribed amlodipine for the first time on October 15, 2018, and prescribed losartan for the first time on November 2, 2018. Plaintiff returned to work in March 2019 with a doctor's note stating he could return to full-duty work without activity restrictions. The first evidence of sickness following Plaintiff's return to work was July 5, 2019, when Plaintiff went to Lake After Hours to treat his vomiting (notably, Plaintiff had not gotten sick during the prior seven months when he did not take his hypertension medications as prescribed). R. Doc. 38-4, pp. 21-22; R. Doc. 38-13, pp. 8-10, 13, 16, 24; R. Doc. 38-15, pp. 4-7, 9; R. Doc. 38-16, pp. 7-8, 14; R. Doc. 38-3, pp. 33-34, 38-39, 75-76, 116; R. Doc. 38-14, p. 5.; R. Doc. 39-21. Finally, Plaintiff's health post-employment with UOP is not "material" to this motion. Fed. R. Civ. P. 56(a); Local Rule 56(c)." Rec. Doc. 40-1, ¶159.

[152] Rec. Doc. 39-32, p. 68. Defendant denies this: "Denied as not material. Fed. R. Civ. P. 56(a); Local Rule 56(c)." Rec. Doc. 40-1, ¶160.

[153] Rec. Doc. 39-28, ¶ 6. Defendant denies this: "Plaintiff's health was not "at its worst" from mid- October 2018 to late July 2019. Plaintiff returned to work in March 2019 with a doctor's note stating he could return to full-duty work without activity restrictions. The first evidence of sickness following Plaintiff's return to work was July 5, 2019, when Plaintiff went to Lake After Hours to treat his vomiting (notably, Plaintiff had not gotten sick during the prior seven months when he did not take his hypertension medications as prescribed). R. Doc. 38-3, pp. 75-76, 116; R. Doc. 39-21." Rec. Doc. 40-1, ¶161.

switched to dyazide, Plaintiff claims he has had minimal side effects and his health has been restored. Since that time, he is ready, able, and willing to work.[154]

Plaintiff claims he initiated the ADA interactive process, but UOP responded by firing him on August 16, 2019.[155] Plaintiff points to Barbour's testimony that he recalled a conversation within the last month of Plaintiff's employment about Plaintiff's heart medicine causing his swollen foot.[156]

Plaintiff contends UOP's attendance policy vaguely and inadequately provides for ADA leave by stating only that leave is also available for "other absences protected by law."[157] UOP HR official Angela Broussard initially testified that "there's no such thing as ADA leave" but later agreed that ADA leave is available under the attendance policy.[158]

---

[154] Rec. Doc. 39-22 at UOP735; Rec. Doc. 39-27, ¶¶ 24, 27. Defendant denies this: "Plaintiff's health was not "restored" from his alleged period of ill health from mid-October 2018 to late July 2019. Plaintiff returned to work in March 2019 with a doctor's note stating he could return to full-duty work without activity restrictions. The first evidence of sickness following Plaintiff's return to work was July 5, 2019, when Plaintiff went to Lake After Hours to treat his vomiting (notably, Plaintiff had not gotten sick during the prior seven months when he did not take his hypertension medications as prescribed). R. Doc. 38-3, pp. 75-76, 116; R. Doc. 39-21." Rec. Doc. 40-1, ¶164.

[155] Rec. Doc. 39-5. Defendant denies this: "Young never initiated the interactive process. Young was not disabled. Defendant terminated Plaintiff on August 16, 2019 because he had accumulated sufficient occurrences to trigger termination under the Attendance Policy. Plaintiff never told Defendant he believed his absences were related to his hypertension and never asked Defendant for an accommodation of unscheduled leave time to get his alleged hypertension-related conditions under control. R. Doc. 38-4, pp. 25-28, 62; R. Doc. 38-6, pp. 4, 9-11; R. Doc. 38-9, pp. 12-14." Rec. Doc. 40-1, ¶165.

[156] Rec. Doc. 39-33, pp. 15-16. Defendant denies this: "Plaintiff misstates Glenn Barbour's testimony. Barbour testified that in the **last month** of Plaintiff's UOP employment (i.e., mid- July to mid-August 2019, after Plaintiff's several  attendance violations occurred), Barbour recalled a conversation with Plaintiff about Plaintiff visiting a doctor for his heart medicine. Plaintiff testified he was "not totally positive," but Plaintiff may have told him that Plaintiff had to change his heart medicine "because that's part of what caused his foot to mess up." R. Doc. 39-33, p. 5." Rec. Doc. 40-1, ¶167. (emphasis in original).

[157] Rec. Doc. 39-37, p. 17; Rec. Doc. 39-7 at item 'vi'. Defendant denies this: ""Absences protected by law" clearly encompasses absences taken pursuant to the ADA, a federal law. Moreover, employees seeking reasonable leave accommodations under the ADA are provided detailed steps for obtaining such accommodations in Defendant's separate Employees and Applicants with Disabilities Policy. Defendant's Employees and Applicants with Disabilities Policy clearly provides: "A leave of absence may be a form of reasonable accommodation [under the Americans with Disabilities Act] under certain circumstances." R. Doc. 38-9, pp. 5, 16; R. Doc. 38-5, pp. 5-6, 8-12." Rec. Doc. 40-1, ¶168.

[158] Rec. Doc. 39-36, pp. 12, 29-30. Defendant denies this: "Angela Broussard was confused by the term "ADA leave" because the ADA speaks in terms of "ADA reasonable accommodations," not "ADA leave." Broussard testified leave could be a type of reasonable accommodation under the ADA, but this would

Plaintiff also claims UOP failed to instruct its supervisors in 2018 how to implement its revised attendance policy.[159] Further, Plaintiff argues that UOP HR's sole role in reaching discipline decisions for attendance issues is to affirm that the number of absences necessary to trigger a firing is calculated correctly.[160]

Plaintiff offers the following medical facts derived from internet articles. A side effect of amlodipine is drowsiness.[161] Swelling of extremities is a common side effect of

___

depend on the specific facts of the employee's medical situation and his job position. R. Doc. 39-36, pp. 3-6. When undersigned counsel questioned Broussard, Plaintiff's counsel did not make an objection on the record for leading the witness; thus his characterization of the questioning is inappropriate and any objection to the same has been waived. Fed. R. Civ. P. 32(d)(3)(b)." Rec. Doc. 40-1, ¶169.

[159] Rec. Doc. 39-33, pp. 7-8. Defendant denies this: "The Attendance Policy document clearly instructs supervisors on how to implement the policy. All Human Resources policies are on Defendant's "HR Help" electronic system, which provides direct support to employees seeking HR-related assistance. Employees can also visit "HR Online," which is Defendant's web portal that contains all of Defendant's HR-related documents. Employees are also required to complete "self-directed learnings" on all company policies. Plaintiff testified he was aware of the Attendance Policy and had reviewed this Policy when he worked at UOP. Plaintiff admitted he understood the amounts of occurrences that would result from each type of absence under the Policy. R. Doc. 38-3, pp. 102-103; R. Doc. 39-36, p. 5; R. Doc. 38-3, pp. 18-19." Rec. Doc. 40-1, ¶170.

[160] Rec. Doc. 38-1, p. 18 (computer file page 23). Defendant denies this: "Termination decisions go through several levels of Human Resources ("HR") review. The HR representative for UOP Baton Rouge ("Local HR") first reviews the employee's entire attendance file to ensure termination is appropriate. If Local HR deems termination appropriate, Local HR's supervisor must then approve this decision. Finally, the HR Director must approve the decision of Local HR's supervisor. R. Doc. 38-9, pp. 10-11; R. Doc. 38-8, p. 21." Rec. Doc. 40-1, ¶171.

[161] National Library of Medicine, Nat'l Inst. of Health, U.S. Dept. Health & Human Serv., Amlodipine, medlineplus.gov/druginfo/meds/a692044.html; Rec. Doc. 39-39, p. 19. Defendant denies this: "Drowsiness is generally not a common side effect of blood pressure medications, and is a rare to non-existent side effect of amlodipine. R. Doc. 38-13, pp. 8, 13; R. Doc. 38-15, p. 9. Further, in support of this "fact," Plaintiff cites an uncorroborated internet article. Defendant objects to Plaintiff's use of this uncorroborated internet article under Fed. R. Civ. P. 56(c)(2), because it is inadmissible and/or hearsay evidence. Fed. R. Evid. 801, 802, 901. "Uncorroborated internet evidence" is not competent summary judgment evidence. *Morrissey v. King*, No. 2:13-CV-0074, 2014 WL 4802436, at *9 n.8 (N.D. Tex. Sept. 26, 2014); Martin v. Seal, No. CIV.A. 11-726-DEK, 2014 WL 2890125, at *4 n.9 (E.D. La. June 25, 2014); *Taylor v. Kerr-McGee Corp.*, No. CIV.A. 00-2102, 2006 WL 39260, at *3 (W.D. La. Jan. 5, 2006)." Rec. Doc. 40-1, ¶176.

amlodipine.[162]    Vomiting can be a symptom of hypertension.[163]  Hypertension is exacerbated by obesity.[164]  A healthy reading for blood pressure is 120/80.[165]

Plaintiff filed this suit asserting two types of disability discrimination under the ADA – disparate treatment and failure to accommodate.  Plaintiff also seeks punitive damages.  UOP has moved for summary judgment on all claims.

## II.    EVIDENTIARY RULINGS

As noted, the Court has excluded some of Plaintiff's purported countervailing statements of fact because: (1) the statements have no record citation; (2) the record citation does not support the offered fact(s); and some statements are legal arguments

---

[162] Nat'l Library of Medicine, Nat'l Inst. of Health, U.S. Dept. Health & Human Serv., Amlodipine, medlineplus.gov/druginfo/meds/a692044.html; Rec. Doc. 39-40, p. 51. Defendant denies this: "Amlodipine can cause swelling, but such swelling is generally bilateral (on both sides), painless, and mild. R. Doc. 38-13, p. 9. Further, in support of this "fact," Plaintiff cites an uncorroborated internet article. Defendant objects to Plaintiff's use of this uncorroborated internet article under Fed. R. Civ. P. 56(c)(2), because it is inadmissible and/or hearsay evidence. Fed. R. Evid. 801, 802, 901. "Uncorroborated internet evidence" is not competent summary judgment evidence. *Morrissey v. King*, No. 2:13-CV-0074, 2014 WL 4802436, at *9 n.8 (N.D. Tex. Sept. 26, 2014); Martin v. Seal, No. CIV.A. 11-726-DEK, 2014 WL 2890125, at *4 n.9 (E.D. La. June 25, 2014); *Taylor v. Kerr-McGee Corp.*, No. CIV.A. 00-2102, 2006 WL 39260, at *3 (W.D. La. Jan. 5, 2006)." Rec. Doc. 40-1, ¶177.

[163] Rec. Doc. 39-40, p. 54 (hypertension & vomiting); Nat'l Inst. Health, High blood pressure and older adults, www.nia.nih.gov/health/high-blood-pressure-and-older-adults. Defendant denies this: "If a person, such as Plaintiff, has hypertension and stops taking his hypertension medications, his hypertension could cause him to get sick and start vomiting. R. Doc. 39-40, p. 6. Further, in support of this "fact," Plaintiff cites an uncorroborated internet article. Defendant objects to Plaintiff's use of this uncorroborated internet article under Fed. R. Civ. P. 56(c)(2), because it is inadmissible and/or hearsay evidence. Fed. R. Evid. 801, 802, 901. "Uncorroborated internet evidence" is not competent summary judgment evidence. *Morrissey v. King*, No. 2:13-CV-0074, 2014 WL 4802436, at *9 n.8 (N.D. Tex. Sept. 26, 2014); *Martin v. Seal*, No. CIV.A. 11-726-DEK, 2014 WL 2890125, at *4 n.9 (E.D. La. June 25, 2014); *Taylor v. Kerr-McGee Corp.*, No. CIV.A. 00-2102, 2006 WL 39260, at *3 (W.D. La. Jan. 5, 2006)." Rec. Doc. 40-1, ¶178.

[164] Nat'l Library of Medicine, Nat'l Inst. of Health, U.S. Dept. Health & Human Serv., Health risks of overweight & obesity, www.niddk.nih.gov/health-information/weight-management/adult-overweight-obesity/health-risks. Defendant denies this as not supported by competent evidence. "In support of this "fact," Plaintiff cites an uncorroborated internet article. Defendant objects to Plaintiff's use of this uncorroborated internet article under Fed. R. Civ. P. 56(c)(2), because it is inadmissible and/or hearsay evidence. Fed. R. Evid. 801, 802, 901. "Uncorroborated internet evidence" is not competent summary judgment evidence. *Morrissey v. King*, No. 2:13-CV-0074, 2014 WL 4802436, at *9 n.8 (N.D. Tex. Sept. 26, 2014); Martin v. Seal, No. CIV.A. 11-726-DEK, 2014 WL 2890125, at *4 n.9 (E.D. La. June 25, 2014); *Taylor v. Kerr-McGee Corp.*, No. CIV.A. 00-2102, 2006 WL 39260, at *3 (W.D. La. Jan. 5, 2006)." Rec. Doc. 40-1, ¶179.

[165] Rec. Doc. 39-21 at UOP761; Nat'l Inst. Health, High blood pressure and older adults, www.nia.nih.gov/health/high-blood-pressure-and-older-adults. Defendant objects to the internet evidence offered to support this statement on the same grounds raised above.

rather than statements of fact.

Defendant challenges Plaintiff's citations to the Nat'l Library of Medicine, Nat'l Inst. of Health, U.S. Dept. Health & Human Serv. website in support of certain offered facts about the potential side effects of the prescription medications Plaintiff was taking. Defendant argues these are uncorroborated internet articles that constitute hearsay under the Federal Rules of Evidence.  The Court overrules this objection because courts routinely take judicial notice of federal government websites, and the articles provided by Plaintiff are not uncorroborated internet articles.

In *Hicks v. Corrections Corp. of America*, a defendant complained that a court "improperly took judicial notice of various websites and medical data, specifically, the medical encyclopedia in medlineplus.gov."[166]  The district court for the Western District of Louisiana found this argument meritless:

> MedlinePLUS is a federal government website, sponsored by the National Library of Medicine and the National Institutes of Health, which is routinely used in this district and in other courts. The incidental references to medical definitions, with appropriate citations, are informational only and do not purport to form any basis for the ultimate conclusions reached. *Bowie ex rel. Bowie v. Barnhart*, 194 Fed.Appx. 241 (5th Cir. 2006). Furthermore, defendants have not shown any of the definitions are incorrect nor have they submitted alternative definitions. Therefore, the references are appropriate[.][167]

Additionally, in *Riverkeeper v. Taylor Energy Co., LLC*, the court noted that "[c]ourts around the country have held that printouts from government websites satisfy Rule

---

[166] No. CV08-0687-A, 2009 WL 2969768, at *21 (W.D. La. Sept. 11, 2009).

[167] *Id.*; *see also Sons v. Medtronic Inc.*, 915 F.Supp.2d 776, 781 (W.D. La. 2013)("A court 'may take judicial notice of and consider the public records of the FDA …'"); *Johnson v. United Healthcare of Texas, Inc.*, 167 F.Supp.3d 825, 835 ("[D]istrict courts in this circuit have routinely held that materials printed off a government website are admissible under Rule 803(8) of the Federal Rules of Evidence. *See, e.g.*, *Riverkeeper v. Taylor Energy Co.*, LLC, 113 F.Supp.3d 870, 881 (E.D. La.2015); *Kew v. Bank of Am., N.A.*, No. H–11–2824, 2012 WL 1414978, at *3 n. 4 (S.D. Tex. Apr. 23, 2012)).

803(8)—the public records exception to the hearsay rule.[168] Furthermore, '[f]ederal courts consider records from government websites to be self-authenticating under Rule 902(5).'"[169]

The decisions Defendant cites in support of this argument reference independent websites and/or internet articles, not federal government websites; thus, they are inapposite here.  The articles submitted by Plaintiff are competent summary judgment evidence.

## III.    LAW & ANALYSIS

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[170]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[171]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[172]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the

---

[168] 113 F.Supp.3d 870, 881, n. 52 (E.D. La. 2015)(citing *e.g., E.E.O.C. v. E.I. Du Pont De Nemours & Co.*, No. Civ. A. 03–1605, 2004 WL 2347559, at *1 (E.D. La. Oct. 18, 2004) (collecting cases); *Williams v. Long*, 585 F.Supp.2d 679, 690–91 (D.Md.2008) (same); *Estate of Gonzales v. Hickman*, No. ED CV 05–660 MMM (RCx), 2007 WL 3237727, at *2 n. 3 (C.D. Cal. May 30, 2007)).

[169] *Id.* (quoting *Paralyzed Veterans of Am. v. McPherson*, No. C 06–4670 SBA, 2008 WL 4183981, at *7 (N.D. Cal. Sept. 9, 2008)).

[170] Fed. R. Civ. P. 56(a).

[171] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[172] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).

existence of a genuine issue concerning every essential component of its case.'"[173] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[174]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[175]  All reasonable factual inferences are drawn in favor of the nonmoving party.[176]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[177]  "Conclusory allegations unsupported by specific facts … will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint.'""[178]

### B.  Disability Discrimination - Disparate Treatment under the ADA

Plaintiff admits that he has no information relating to the alleged similarly situated comparators at issue in his disability discrimination disparate treatment claim.[179]  He also

---

[173] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[174] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[175] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[176] *See Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[177] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)(internal citations omitted).
[178] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249)(alteration in original).
[179] *See* Rec. Doc. 39-1, ¶¶ 93-101, 103-105.  For this reason, the Court has excluded from the Factual Background all facts relating to the health conditions of other UOP employees.  Plaintiff appears to merge the elements of a disparate treatment claim and a failure to accommodate claim, arguing that the *McDonnell Douglas* burden-shifting standard applies, *see* Rec. Doc. 43, p. 4, and that he suffered an adverse employment action, Rec. Doc. 39, p. 28 (Brief, p. 21); the Court did not address these arguments as they are inapposite to an ADA failure to accommodate claim.

abandoned this claim by failing to address it in his *Opposition*; therefore, Defendant is entitled to summary judgment on Plaintiff's ADA disparate treatment claim.[180]

### C.  Failure to Accommodate under the ADA

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability [...] unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."[181]  To sustain a failure to accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations."[182]

#### 1.    Qualified Individual with a Disability

The Parties dispute whether Plaintiff was disabled under the ADA.  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual."[183]  In addition, there must be "a record of such an impairment," or the individual must be "regarded as having such an

---

[180] Plaintiff has failed to meaningfully (or, indeed, in any way) oppose Defendant's *Motion for Summary Judgment* on his disability discrimination (disparate treatment) claim.  This constitutes a waiver of the claim under appliable jurisprudence.  "[F]ailure to brief an argument in the district court waives that argument in that court." *JMCB, llc v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n. 10); *see also Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue." (citations omitted)), *aff'd sub nom.*, *Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).
[181] 42 U.S.C. § 12112(b)(5)(A).
[182] *Feist v. Louisiana Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)(internal quotation marks omitted).
[183] 42 U.S.C. § 12102(1)(A).

impairment."[184]   The determination of disability is a three-part test: (1) impairment, (2) major life activity, and (3) whether the impairment substantially limits at least one major life activity.[185]   "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."[186]   "Major life activities include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'"[187]

Around 2008, Congress noted that "the Supreme Court and EEOC had interpreted the 'substantially limits' standard to be a more demanding one than Congress had intended."[188]  To correct this, Congress enacted "[t]he ADA Amendments Act of 2008 ("ADAAA")which "essentially broadened the definition of 'disability' to make it easier for an individual seeking protection under the ADA to establish that he or she has a disability."[189] The ADAAA did not alter the definition of disability, but it added provisions 42 U.S.C. § 12102(2)-(4) to supersede cases that interpreted the scope of 'disability'

---

[184] *Id.* at  § 12102(B)-(C).
[185] *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003).
[186] *Willis v. Noble Environmental Power LLC.*, 143 F.Supp.3d 475, 481 (N.D. Tex. 2015)(quoting 29 C.F.R. § 1630.2(j)(1)(ii)).
[187] *Kemp v. Holder*, 610 F.3d 231, 235 (5th Cir. 2010) (quoting 42 U.S.C. § 12102(2)(A)).
[188] 42 U.S.C. § 12101 note (ADA Amendments Act of 2008) (expressly disapproving of prior Supreme Court decisions and EEOC interpretations of the "substantially limits" standard); *see Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013) (stating that the ADAAA was passed in part to correct the perceived misconception that the "substantially limits" standard is a demanding inquiry).
[189] *McNeal v. Louisiana Department of Public Safety and Corrections*, No. 20-312-JWD-EWD, 2021 WL 359737, at *13 (M.D. La. Feb. 2, 2021)(citing *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245–46 (5th Cir. 2013)).

narrowly."[190]  Under these amendments, the term "'disability' now includes an impairment that is episodic or in remission if it would substantially limit a major life activity when active; examples include epilepsy, **hypertension**, asthma, diabetes, major depression, bipolar disorder, schizophrenia, and cancer."[191]

Defendant disputes that Plaintiff's hypertension substantially limits the major life activity of sleeping, particularly because it claims Plaintiff has no evidence that his hypertension medications caused his drowsiness, and Plaintiff's own doctors testified that these medications would not produce that side effect on a routine basis. Defendant also points to undisputed evidence discussed above that, on several of Plaintiff's tardy or no-show occurrences, he was unaware if he had even taken his hypertension medications; thus, Plaintiff cannot establish that his claimed disability - hypertension medications – substantially limited a major life activity or that alleged side effects caused him to receive attendance infractions at work.

Defendant also contends that the pain medications Plaintiff took for gout, which are opioids, are far more likely to cause drowsiness.  It is undisputed that neither Plaintiff's hypertension nor his hypertension medications medically caused Plaintiff's gout; thus, if the side effects of pain medications caused Plaintiff's tardiness/absenteeism, this did not trigger coverage under the ADA.[192]  Following a fourteen-week FMLA leave period for gout, Plaintiff was released to return to work on March 13, 2019, with no restrictions.  But his attendance problems persisted.

---

[190] *Id.* (citing *Neely*, 735 F.3d 245).

[191] *Weed v. Sidewinder Drilling, Inc.*, 245 F.Supp.3d 826, 834 (N.D. Tex. 2017)(citing ADA Amendments Act of 2008, §§ 4, § 3(4)(D), [122 Stat. 3553, 3555]; 29 C.F.R. § 1630.2(j)(5))(emphasis added).

[192] It is undisputed that Plaintiff requested and was granted 12 weeks of FMLA leave associated with recovering from gout; it is further undisputed that Plaintiff took two more weeks off before returning from FMLA leave, and Defendant did not discipline Plaintiff in any way as a result.

Plaintiff was tardy or absent on April 27, 2019, May 2, 2019, May 30, 2019, and July 11, 2019, purportedly due to gout symptoms he believed were caused by his hypertension medications.[193]  But in response to Defendant's summary judgment motion, Plaintiff admits, and all medical evidence confirms, that gout is not caused by hypertension medications;[194] therefore, his hypertension medications did not cause his attendance infractions.  Plaintiff's insistence that his hypertension medications caused his foot to swell and his recurring drowsiness is based only on his own opinion, an opinion contradicted by all medical evidence presented and discussed at length above.  The Court accepted as evidence and considered the National Institute of Health articles submitted by Plaintiff setting forth potential side effects of his prescribed medications.  However, these articles do not overcome summary judgment because Plaintiff has offered no medical evidence linking these alleged side effects to his medical conditions.

Plaintiff acknowledges he cannot carry his trial burden of causation: "It is true that Mr. Young's medical condition during his *tempus horribilis* is complicated as to when it was known with some certainty that he was suffering from hypertension, hypertension medication, gout, or some combination of the above."[195] Plaintiff insists his July 11, 2019 absence should have been excused because he is certain he took hypertension medication the night before.  However, Plaintiff's own deposition testimony demonstrates that he did not realize that indomethacin, which he took after his foot swelled on July 10, 2019 along with hydrocodone, is not a hyptertension medication.  Moreover, Plaintiff readily admits that "[f]actors completely unrelated to hypertension, including Plaintiff's

---

[193] Rec. Doc. 1, ¶¶ 17, 31, 34, 36.
[194] Rec. Doc. 39-1, ¶ 39.
[195] Rec. Doc. 39, p. 23 (Brief, p. 16).

daily tobacco vaping habit, asthma, obesity, and potential undiagnosed sleep apnea could have been responsible for Plaintiff's inability to sleep well while taking hypertension medications."[196]

Although courts are to broadly interpret what constitutes a disability under the ADA, and hypertension may be considered a disability where it can be shown to substantially limit a major life activity, "[t]he ADA does not ... create an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-a-vis the employee."[197] Plaintiff has failed to present competent summary judgment evidence to show a triable fact issue that he was disabled under the law.

## 2.    Notice

Assuming Plaintiff could establish that he is a qualified individual with a disability, Plaintiff has failed to demonstrate a triable issue that UOP was on notice of his alleged disability and his need for accommodation. To meet the notice element, an employee must not only inform an employer that he is disabled but must also inform the employer of any specific resulting limitations,[198] and the burden is on the **employee** to inform the employer.[199]    Where the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests "primarily upon the employee ... **to specifically identify the disability and**

---

[196] Rec. Doc. 39-1, ¶ 38.
[197] *Kent v. Roman Catholic Church*, No. 96-1505, 1997 WL 30201 at *2 (E.D.La. Jan. 23, 1997); *see also Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 796, n. 3(1st Cir.1992)(rejecting medical student's claim that school failed to reasonably accommodate his learning disability, in part because student never requested alternative testing method until he had failed exam three times and faced expulsion) and *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 85, 91 (1st Cir. 2012)(rejecting insurance salesman's claim that his employer failed to accommodate his medical condition making him unable to concentrate, which he disclosed for the first time after he failed to pass a required licensing examination by the company-set deadline.).
[198] *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996).
[199] *See id.* at 165.

**resulting limitations**, and to suggest the reasonable accommodations."[200]  The employee's request for accommodations "must explain that the adjustment in working conditions or duties [he] is seeking is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase 'reasonable accommodation.'"[201] When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in "flexible, interactive discussions to determine the appropriate accommodation."[202]

Plaintiff maintains that he was not required to say the magic word "hypertension" or to identify a specific disability; rather, he contends the fact that his supervisors knew he was absent/tardy due to "medical conditions" and/or his need for medical treatment was sufficient notice of a disability to trigger UOP's obligation to accommodate him. Plaintiff maintains that asking to be excused for a doctor's appointment also constitutes sufficient notice of the need for a disability accommodation. Plaintiff argues the "circumstances and the requests indicated that although the name of the disability was not clear, it was clear an ADA disability existed. This should have triggered the interactive process and the ADA application process to determine the specific disability."[203]  Plaintiff claims he "repeatedly complained to his superiors that his leave should be excused because of this onset of a weird illness and asked for help."[204]

However, "simply giving notice of a medical issue to an employer is not sufficient

---

[200] *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011)(citing *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009))(emphasis added).
[201] *Chevron Phillips*, 570 F.3d at 621 (emphasis added).
[202] *Hebert v. Ascension Parish School Board*, 396 F.Supp.3d 686, 701 (M.D. La. 2019)(quoting *Griffin*, 661 F.3d at 224)).
[203] Rec. Doc. 39, p. 24 (Brief, p. 17).
[204] *Id.* at p. 25 (Brief, p. 18).

to request an accommodation – the employee bears the burden of 'requesting specific reasonable accommodations.'"[205]    Not only is Plaintiff's position directly contrary to the law, Plaintiff's own admissions in this matter fail to support his claim that UOP had notice of his purported disability.    First, Plaintiff cannot attribute knowledge of his hypertension to UOP based on his August 2018 physical examination with Nurse Watts and Dr. Scimeca as he admits they are not UOP employees but work for a third-party medical provider.[206]    Plaintiff also admits he did not inform UOP before his October 15, 2018 absence, or when he was disciplined for this absence, that the absence was related to treatment for hypertension.[207]    Plaintiff also admits he never told UOP before the November 2018, April 2019, and May 2019 attendance violations, or when he was disciplined for these violations, that he was being treated for hypertension treatment or that his absences were hypertension-related.[208]    More often than not, the record shows that Plaintiff's requests to be excused occurred **after** an attendance infraction was incurred.    Plaintiff submits text messages and phone records indicating times that he attempted to reach supervisors to notify them of a medical appointment, but none of this evidence connects any request to Plaintiff's hypertension medication.    The text messages to Oscar Kitts on July 2, 2019 and July 11, 2019 say, respectively: "Oscar this is Darius letting you know that I'm not going to make it I'm sick" and "Not gonna make it".[209]    Other

---

[205] *Taylor v. Harrison Cnty.*, No. 1:20cv319-HSO-RHWR, 2022 WL 704208, at *5 (S.D. Miss. Mar. 8, 2022)(quoting *Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F. Supp. 2d 528, 565 (S.D. Tex. 2011) ("[Plaintiff] testified that although she gave [defendant] notice of her diagnoses, symptoms and medications, she did not ask for any accommodations ... [Plaintiff] bears the burden of requesting specific reasonable accommodations under the ADA, so [defendant] is entitled to summary judgment on the reasonable accommodations issue.")).
[206] *See* Rec. Doc. 39-1, ¶¶ 24, 26.
[207] *Id.* at ¶¶ 42, 44, 76.
[208] *Id.* at ¶¶ 44, 47, 76.
[209] Rec. Doc. 39-26.

text messages asked Spencer and/or Kitts to call Plaintiff but do not give a reason or explanation.  Plaintiff's phone records show that calls were placed to certain numbers but do not establish whether contact was made or, if so, the nature of the communication.

It is undisputed that when Plaintiff returned from FMLA leave for gout on March 13, 2019, he was released back to work with no restrictions.[210]  There is no mention in his release from Dr. Hall that Plaintiff needs any accommodation for any prescription medication.  There is no evidence in the entire record demonstrating that Plaintiff ever submitted to UOP medical documentation from any medical provider that his hypertension medications may cause him to suffer disabling side effects.

Moreover, if Plaintiff could not determine when or if he took his hypertension medications, how then could UOP be charged with such knowledge every time Plaintiff was late or absent? Accordingly, Plaintiff has failed to demonstrate a triable issue as to notice.

### 3.    Reasonableness of Accommodation

The Court also finds that Plaintiff's requested accommodations were unreasonable. Critically, "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation."[211] The Fifth Circuit has held that an employer is not required "to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so."[212] In *Pegues v. Mississippi State Veterans Home*, the Fifth Circuit

---

[210] *Id.* at ¶ 71.

[211] *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009)(citing *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 457 (6th Cir.2004)).

[212] *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999); *see also Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) ("As a matter of law, it is an unreasonable accommodation for the employer to have to exempt the employee from performance of an essential function of the job.").

held that excusing an employee from performing his or her essential functions, and leaving performance of those functions to other employees, is "an undue hardship in and of itself."[213]

Plaintiff's sought accommodation is to be allowed "intermittent unscheduled leave or short periods of leave as an accommodation"[214] or for UOP to rewrite its Attendance Policy to provide for general sick leave, arguing that other UOP regional plants had a more favorable leave policy.[215] These requests are unreasonable as a matter of law. Plaintiff offers no authority to support the reasonableness of either request for any employee in any line of work.  The ADA does not require an employer to allow an employee to miss work or come in late without prior notice or explanation; neither does it require a business to rewrite its attendance policy to accommodate an employee's excessive absenteeism.  UOP offered competent summary judgment evidence that when an Operator fails to show for an assigned shift, it is often required that another worker must cover the absent employee's shift.[216]  In a plant that operates around the clock, Plaintiff's requested accommodations would constitute an undue hardship on UOP.

Plaintiff argues he did not seek a retroactive accommodation but also states that he was "seeking help for his past and future absences due to sickness."[217]  But as the court explained in *Simon v. Schlumberger Technology Corp.*:

> It is well-settled that proper accommodation requests under the ADA are prospective, according to the EEOC's Enforcement Guidance. "'Since [a] reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability.'" *Brookins v. Indianapolis Power & Light Co.*, 90 F.Supp.2d 993,

---

[213] 736 F. App'x 473, 477 (5th Cir. 2018).
[214] Rec. Doc. 1, ¶ 43.
[215] Rec. Doc. 39, pp. 25-26 (Brief, pp. 18-19).
[216] Rec. Doc. 38-7, pp. 29-30 (Kitts Depo.); Rec. Doc. 38-6, pp. 11-12 (Smithhart Depo. pp. 17-18).
[217] Rec. Doc. 39, p. 27 (Brief, p. 20).

1007 (S.D.Ind.2000)(citing U.S. Equal Opportunity Employment Commission, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act at 24, question number 35); *see also Davila v. Qwest Corp*., 113 Fed. Appx. 849, 854 (10th Cir.2004) ("[A]s many cases have recognized in various contexts, excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA.") The Fifth Circuit has explained that an employer is not required to approve a "retroactive accommodation" or "second chance" excusing prior misconduct stemming from the alleged disability. *Burch v. Coca–Cola Co*., 119 F.3d 305, 320 n. 14 (5th Cir.1997). Thus, "[W]hen an employee requests an accommodation for the first time only after it becomes clear than [sic] an adverse employment action is imminent, such a request can be 'too little, too late.'" *Jones v. Nationwide Life Ins. Co*., 696 F.3d 78, 90 (1st Cir. 2012).[218]

Indeed, "courts have recognized that an accommodation that requires an employer to ignore prior misconduct, including a violation of an attendance policy, is not the kind of reasonable accommodation mandated under the ADA."[219]

Notably, the record indicates that UOP provided Plaintiff a reasonable accommodation when medical documentation supported the need for medical leave. Plaintiff admits that he received continuous FMLA leave from November 28, 2018 through February 20, 2019, **plus additional unpaid leave through March 11, 2019**, to receive treatment for gout, after Plaintiff submitted medical documentation from his treating physicians indicating that his medical condition affected his ability to walk and bear weight on his left foot.[220]

Plaintiff essentially wanted UOP to excuse him, after the fact, every time he was tardy or absent due to the purported side effects of his hypertension medication, without

---

[218] No. 13-CV-3074, 2015 WL 3952739, at *11 (W.D. La. June 26, 2015).
[219] *Green v. Medco Health Solutions of Texas, L.L.C.*, 560 F. App'x 398, 402 (5th Cir. 2014)(citing *e.g., Brookins v. Indianapolis Power & Light Co.*, 90 F.Supp.2d 993, 1007 (S.D.Ind. 2000) ("To the extent [the employee] argues that [the employer] should have overlooked his long string of absences, this is not an 'accommodation' that is required by the ADA.")(alteration in original)).
[220] Rec. Doc. 39-1, ¶ 51 (emphasis added).

being certain that he had even taken such medications prior to incurring attendance occurrences.  Plaintiff has failed to demonstrate a triable issue regarding the reasonable of his requested accommodations.

## IV.    CONCLUSION

For the reasons set forth above, UOP's *Motion for Summary Judgment*[221] is GRANTED.  All pending motions in this matter are denied as moot. *Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 25th day of January, 2024.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[221] Rec. Doc. 38.